23-5791 David Bell et al. v. Kokosing Industries Inc. et al. Argument not to exceed 15 minutes for the appellant and 15 minutes to be shared by the appellees. Counsel, you may proceed for the appellant when ready. Good morning, Your Honor. Honors. My name is Jeffrey M. Sanders, and I represent the appellants David and Cindy Bell. I have asked for five minutes in rebuttal.  This case should be reversed because the district court's ruling overturned longstanding blackletter law in Kentucky related to unambiguous contracts and intentional torts. I'd like to first talk about the contract claims. Under Kentucky law, and indeed all state courts, federal courts, a court must enforce the terms of an unambiguous contract. The contract in question is the waste agreement. There was never any type of question raised or any allegation made that the contract was unambiguous or ambiguous. What are the markings on the contract? There's some places there are X's, some things are lined out, some underlined. Did you ever figure out what those were? The testimony was that David Bell made those cross-outs. There are certain cross-outs, and that Kokosing agreed to those cross-outs, and that's the way the contract was enforced or carried out. So we should interpret it as if all of those sections that have lines on or near them are not part of the contract? That's what the parties agreed to, but with those cross-outs, there's no question. There was no question raised that the contract was somehow ambiguous. Well, in that regard, one of the things that seems to be crossed out is language that says, to the effect of, deliver up to 100,000 pounds, whatever the measurement was. So I never understood your argument about that the Bells were entitled to a certain quantity, because that seemed to be contrary to the express terms of the contract. But if you assume that that's crossed out, then there is no quantity at all. So how do you win on your claim that they didn't get enough fill? The agreement between the parties was that they would have a flat level lot when Kokosing was done. David Bell testified that a member of the United States Army Corps of Engineers told him 30,000 cubic yards would be sufficient, and they simply could not take 100,000 cubic yards because there's no place to put it. This is a relatively small lot, and that's why the 100,000 cubic yards was crossed out. So was there a provision in the contract that said, at the end, there shall be a flat lot? It's not in the contract, ma'am. The parties had that discussion, and that was the whole intent between the parties in order to enter into this contract, that they would have a level lot. You start your whole argument about saying that it's the court's duty to enforce the express terms of the contract, and you just told us that that whole key of quantity is not part of the contract. Before the remediation efforts began on the property, it was a flat level lot up out of the floodplain. But I do agree that the 100,000 cubic yards was crossed out, but certainly the intent of the parties was to have enough fill, sufficient fill, to create a flat level lot out of the floodplain of the Ohio River. But at the end of the day, they enter into a remediation agreement, between Klossing and Bell, that indicates what Klossing will do to remediate the contaminated soil on the property, and what else Bell's wanted that they did. And that envisioned, at least as I understand it, to be a stair step, and the Bell said, fine. So why are we still in court fighting about that? Well, let me give a little bit of background, maybe helpful. It's not as if the Bells simply agreed to have their property graded in the way that it was eventually graded into different levels. The state of Kentucky was involved in this, the Environmental Protection Agency, and the agency wanted a remedy. There was only two remedies, either clean it up fully, or leave part of the waste in the ground, and put an environmental covenant on it, or a restrictive covenant. The Bells were put in the position that they're either going to make the agreement with Cocosine, or they were going to be subject to an enforcement action and a strict liability statute, with fines up to $25,000 per day per violation. I don't believe that anyone would agree that under such circumstances, that they freely entered into this agreement with Cocosine to stair step their property. That was never what they wanted to do. And this property had been in her family for over 100 years. They simply wanted a flat level lot without contamination. How high is the property compared to the river level? I mean, what kind of a height, if we're going to throw a rope down and measure it, how deep would it be? Let's take it from the highest level down to the Superfund site, and it's about 15 feet. 15.5. And the river is just a few feet down below it. It depends on the level of the river. During the flood stage, that lower level would be inundated with river water. Normally, it's probably less than three feet. So if you assume that they had an agreement that it was going to be flat, independent of how many cubic yards it took to do that, they didn't get that. They entered into an agreement with the contractor to how to remediate it. Let's just assume for a second that that doesn't restrict their ability to still complain about not getting what they were hoping to get. At the end of the day, that simply is a question of whether they were damaged by how you construe the terms of the contract.  Correct. And at the end of the day, Bunning looked at the testimony of Bell and the witness that the contractor hired found the contractor's witness to be more credible and found there was no damage, at least as I'm saying, at the end of the day. So whether you agree with that or not, where's the reversible error there? I think it's an abuse of discretion on that finding because of that. It's an abuse of discretion to find one expert witness to be more credible than one lay witness property owner? Well, let's take that in steps. First of all, under Kentucky law, the lay witness can offer an opinion on the value of the property, and he did. The expert witness from Cocosine, the two expert witnesses, testified that all of the contamination was cleaned up. Contamination is not cleaned up. They dumped 2,057 dump truck loads of contamination on the property. They only removed about 900. The state came in and required a restrictive covenant. It's not cleaned up because there was pre-existing contamination on the property? The state has never made a finding of pre-existing contamination, especially that Cindy Bell put contamination that was 26, I believe the testimony was 26 feet under the ground. A court came up with that through an expert who just created that out of whole cloth. There is no finding, there was no finding by the state of Kentucky that Mrs. Bell created pre-existing contamination. Okay, back to the question. You've got one expert, you don't like their opinion. You've got one lay person. I didn't mean to suggest the lay person couldn't offer an opinion or that Mr. Bell didn't have some validity to his opinion. I'm not saying that at all. But the test then is an abuse of discretion to pick one versus the other? Well, I think it's a manifest injustice when... Okay, now that's much different than an abuse of discretion. So here you say, the bottom line is you say there's a manifest injustice because Bunning picked one versus the other? There is no case law that supports a finding that a piece of property that was not contaminated before and the property owner signed a contract with a company to deliver uncontaminated soil. The company comes in and dumps thousands of loads of contaminated soil on the property. One other quick test. There was a test after this contaminated soil was dumped on the property that at least purportedly said that there was already contamination on the property. There's a test that says that, right? There was a test that showed an area that Kassin alleged that was not dumped on had contamination 26 feet below the ground.  But there was never a finding... Bunning took that into account? He took that into account. And you say he shouldn't have? There is no evidence to support a finding that Mrs. Bell dumped contamination on her property. Well, who cares who dumped it? If it was there and Klassing didn't dump it, they're not responsible for it. But that contamination was not the reason that the state of Kentucky came in. And it was all the result of Cocasin's actions. You're saying that the contamination 26 feet underground was due to Cocasin as opposed to some other entity perhaps prior to Mrs. Bell? There is no evidence either way. There's no proof either way where that contamination that's 26 feet under the ground came from. It could have been... No one knows.  Okay. Judge Moore, could I ask you a question? Yes, please. I'd like to ask you about the indemnification clause of the contract. Your position is that that provides for direct claims between the parties. That that is not applicable to third-party claims, but rather to claims between the two parties to the contract. Do you have any authority anywhere in support of your position for that interpretation of this? I'm not sure. Just that the Kentucky law is that if it's unambiguous, it should be enforced. The court should enforce it. This is pretty standard boilerplate indemnification language, is it not? It is. And there's never been a court anywhere that's construed it the way you advocate. I mean, that seems to me rather strange. I'm just saying that I cannot find case law that the courts did not enforce the plain meaning of the indemnification in a contract such as this. Okay. I guess the question is have you found case law that has enforced this particular language for direct claims between the parties like you have here, as opposed to third-party claims? I would, in this case, because the bills were really in two different judicial, two different forms. One, the administrative form in the state of Kentucky, and certainly that's a third-party claim. And we never, we were not trying to enforce the indemnification agreement in that, in the district court action. We asked the district court to put that aside, make a ruling on whether or not the contract applied, indemnification applied, and then send it to the magistrate judge for a hearing on that issue. So the specific indemnification that you're saying now that you want is the indemnification for the attorney's fees in the Kentucky administrative proceeding matter, which you're saying is more like a third-party claim? Yes, ma'am. But they're the same parties, right? I mean, the claims between the contractor and the landowner, right? I'm not sure I understand your question. Well, the, you're seeking your attorney fees from the landowner, or from Cozending, right? Cozending. That's the dispute. I mean, there's not another third party out there that usually you have for indemnification. A third party gets a judgment against one of the parties, and then there's indemnification for the judgment. I mean, there's not a third party here, is there? I would say the third party was the state of the Commonwealth of Kentucky and the Environmental Protection Agency who was threatening and enforcing it. But it's not the state of Kentucky's attorney fees that you're seeking to recover. It's yours, right? Yes, sir. Okay. All right. Thank you. Yes, Your Honor. Thank you. Your red light is on. We've taken you beyond it. May it please the Court, my name is Robert Johnson. I have the privilege of representing one of the two appellees before you today, Kikosin Industrial, Inc. For housekeeping, we did agree to split between Kikosin and the City of Cincinnati ten minutes and five minutes. So I do ask that the Court stop me at ten unless there are further questions. As the panel is aware, this appeal, at least with regard to my client, arises from findings of fact and conclusions of law made by the trial court, Judge Bunning, in the Eastern District of Kentucky following a trial to the Court. With one exception, which was not raised below what the Court was raised for the first time in appellant's briefing, the arguments that you heard in the brief and what Mr. Sanders eventually agreed with regard to breach of contract are arguments with regard to Judge Bunning's findings of fact. The Court cannot reverse on those arguments unless it finds that Judge Bunning was clearly erroneous. My client's minimal burden, which in our briefing I believe we accomplished, was to present the Court with facts on the record that Judge Bunning reasonably could have relied upon to reach the decision that he did. What Mr. Sanders today seems to be saying is there's a manifest injustice that results from accepting Judge Bunning's finding of fact. That's a difficult concept to deal with, being that amorphous, but let me try, Judge McKeague. There are two ways of looking at this case. The one that my client advanced and that Judge Bunning accepted is there was an accidental mischaracterization of some of the soil on the Lick Run project. My client was not charged with characterizing. That wasn't their job. They had no reason to believe that there was a mischaracterization, so in good faith they delivered its 24,000 cubic yards of what was represented to my client as being clean fill to the Bell property. The Bells were actively seeking fill from construction sites and had been doing so for quite a period of time, according to the record. With due respect to Mr. Sanders, that lot wasn't flat before my client started depositing soil. It was basically an open pit. The reason that the Bells wanted soil was so they could landscape, so they could use that area. An open pit as opposed to sloping downwards? More accurately, Judge Moore, it was sloping down. It would look, from the aerial views, when you looked from the front of the property, it looked like a pit, but yes, you're correct. There was a slope down to the river. How was your client going to fill this by making a perpendicular slope to the river area? I don't think that would have worked with fill, Judge Moore. That's why I'm asking. I don't understand. No, there was absolutely no agreement. As Judge McKeague noted, there's no language in the waste agreement that promises a flat lot. What do you think you promised? Your opponent was telling us various things. What did the contract say? The contract said that the Bells would give my client ingress and egress to the property in a manner that the Bells controlled. They would tell us where to exit and enter, and that my client had the right, although not the obligation, to deposit uncontaminated fill. Functionally, the way that happened, and the trial record bears this out, is that the dump trucks, which now dismiss defendant, not part of this appeal, Ashcraft Trucking, would take over. They would dump. Mr. Bell had effectively a bulldozer that he had either leased or borrowed on the property. It was him, or somebody working under him, who was moving the dump soil off. There was nothing in this agreement, in the waste agreement, under which Kukosing agreed it would handle grading or leveling anything. The agreement is very simple, and I agree with Mr. Sanders. It's unambiguous. There are questions as to the ex-outs, but even if you allow all of those ex-outs to remove language from the contract, for purposes of this case, it doesn't change anything. The only thing that the contract did was the Bells agreed to let my client deposit an undefined amount of clean fill. What happened to it after that was completely up to the landowner. To change a little bit to the last issue that we were talking about with your opponent on the indemnification, why shouldn't we view the contract as covering the attorney's fees that the Bells incurred in defending against the Kentucky Department of Environmental Protection action, the Superfund-type action that the government brought? Very simple, Judge Moore. It's a matter of burden of proof, and there is no proof that there were any attorney's fees incurred by the Bells for purposes of an administrative action by the state of Kentucky. But are you agreeing, then, that if there were proof of such expenses, that that would be covered by the indemnification provision? Well, in theory, it could be, Your Honor. But the problem with that, again, the plaintiff has to prove its case. The record in this case is actually undisputed that when the Kentucky Environmental Cabinet sent the notice of violation, it sent it to numerous parties, including the Bells, including Kokosing, including the city of Cincinnati, which was the project owner, and including Ashcraft, the trucking company, saying, we believe there's a violation. There was never an administrative action. Kokosing stepped up. They were the only party that did that. And don't get me wrong, I don't expect the Bells to. They aren't the ones who mischaracterized the suit. But my client stepped up. There was never an administrative proceeding. Once my client stepped up, there was no threat to the Bells. Now, why is that significant? Because it goes back to the principle of indemnification. If you have a right to indemnity, what's the first thing you do? You make demand to be indemnified. If the party that owes the duty of indemnification steps up, then they are in the clear. They're taking on the liability. My client immediately got counsel, worked with the environmental cabinet, and remediated the project. But if the Bells needed to obtain counsel to protect themselves, you're agreeing that it would be covered? If they were required to do so, and most significantly, Your Honor, if Kokosing does not accept the indemnity, if Kokosing says you're on your own, then there would be a right under that indemnity line, which we're not asking the court to read indemnification out. But you're saying it's simply a burden of showing facts at the district court level. Correct. And that such facts were not shown. And the facts were not shown. And to the contrary of that, there was no presentation at the trial court regarding fees. And the only exhibits that were ever proffered were for the entire representation, which means there weren't separate matters created. There was not identification on entries for, this is for Kentucky administrative work, this is for our lawsuit against Kokosing. There was absolutely no evidence from which Judge Bunning would have been in a position to determine I should award these fees. And that's something that is essential for the plaintiff to do. It seems like where the plaintiff arguably went wrong here is they focused on trying to get the judge to refer this back to a magistrate judge to presumably parse out the details that you're pointing out are lacking now. Because they didn't have any right to a magistrate judge. Bunning said no, and then he did it himself. Yes. Was there any point, ignore the magistrate proceeding for a second, was there any point at which the Bells were in some way prohibited from explaining to Judge Bunning exactly what they spent these attorney fees on that they're seeking to recover through the indemnification clause? Absolutely not, Your Honor. As a matter of fact, our understanding is the Bells actually received invoices from their counsel. They would have been in position to be shown the invoices and explain what was what. And did you present this issue to the district judge? I don't believe it was our duty to, but we argued against the award of attorney's fees on any number of bases, and we made it very clear, Your Honor, that our argument was that the indemnity clause could not be interpreted as awarding fees for the direct action. At that point, I think that places plaintiff's counsel on notice. They need to divide that out, and I don't want to go off the record, Judge Moore. Don't go off the record. Yeah, but the plaintiffs were on notice of this. This was not a surprise to them. Thank you. So I see my time is out. You said something about the cross-outs of the contract, and I didn't quite understand what you meant. Do you agree that the cross-outs, that those provisions are not part of the contract or not? Judge Griffin, for purposes of this appeal, I think we're comfortable admitting that they aren't. We honestly don't know what happened there. I don't know if there was a meeting of the minds on certain areas, but none of those are areas that my client supposedly breached. None of those are areas where my client is claiming a defense. The only part of the X-outs that have even any tangential significance are what Judge McKeague noted, that the only reference to 100,000 cubic yards is something Mr. Bell X'd out. Now, even if it's in the contract. There's also one of the clauses that's about damages, and you argue that the damage provision would be inconsistent with the indemnity provision, but if the damage provision is not there, there's no inconsistency, is there? No, I think you're right on that one, Your Honor, and the primary argument that we're trying to make on attorneys' fees is there is no right to indemnification for the direct action. We cited the court to that law, and in addition to that, at the very end, Judge Bunning does have discretion to determine whether fees claimed are reasonable or not, and I don't think we ever got to that point, but he certainly, you could affirm this decision based on the fact. He didn't think that the Bells were entitled to attorneys' fees. All right, but without the damage provision, the damage provision provides that you are responsible for negligence and or breach of contract, contractors, but without that, aren't we just left with, I don't know, what standard are we left with? Well, Judge, I don't think that you need specific damage language in a contract for a party to be able to state a claim for damages for the contract's breach. Maybe if there's affirmative language, well, certainly, if there's affirmative language that limits remedies, that's different. Where you're going wrong there is that under the American rule, if you want to recover attorney fees as a part of your damages, you've got a fee shift in the contract, unless it's a statute that does it, which doesn't apply here. So if we take the damage language out altogether, that makes it even more clear there is no fee shifting in this contract. So you then have to turn to the indemnification clause to see if you can backdoor into attorney fees that way. Agreed, Your Honor. There is no fee shifting in the contract other than to the extent that the indemnifying language calls for it, and it doesn't apply in this case. Yes, the American rule clearly applies to this contract. Is your position that the contract includes the materials that were struck out, or is your position that it does not include those provisions? For purposes of this appeal, we are not arguing that the strikeouts are part of the contract. We just don't know, and I believe Judge Bunning assumed the strikeouts were not part of the contract. We don't take issue with that. In other words, he struck out those things. That is my understanding. And you're not contesting that? That's correct. And my basis for that actually goes back to his opinion on summary judgment, where he notes in response to the Bell's argument that they are entitled to damages because they didn't get 100,000 yards of clean fill, the judge notes Mr. Bell struck that out. Okay. Thank you. Thank you. Good morning, Your Honors. I am Billy Braff on behalf of the Appley City of Cincinnati. The conversation you were just having was about a trial, experts, interpretation of a contract, but for the City of Cincinnati, the discussion is still at the dismissal stage. The issue here is whether or not there is a dismissal. Whether jurisdiction exists over the City of Cincinnati in Kentucky for conduct performed by a different entity. And the answer is no, for a lot of reasons in the City's brief. But because my time is short, I'm going to focus on two reasons. Under the Kentucky's long-arm statute, the City of Cincinnati conducted no business, there's no jurisdiction, and under the requirements of the Due Process Clause, there are no contacts to bring the City into Kentucky. So unless the panel has any questions, I'll focus on the long-arm provision, or the long-arm statute. And let's start with what the Bells argued below. They offered only an agency theory. The district court analyzed that theory and rejected it. On appeal, the Bells have not revived the agency theory. Instead, they have offered numerous theories of jurisdiction which have changed. And the only thing here that's been consistent is that the City of Cincinnati never transacted any business in Kentucky and doesn't have minimum contacts with the long-arm statute. And how do we know this? We know this first on the contracts submitted below. And the contractual relationship between Kekosing and the Bells doesn't name the City. There's actually a term saying the City isn't part of the contract. And that's consistent with the agreement between the City and Kekosing. Respectfully, Kekosing's counsel said Kekosing was not responsible for testing the materials. That's actually not true. The City is not responsible for testing the materials. You can see that on page ID 349 and 649 below. Under the agreement between the City and its contractor, it's clear when soil leaves the site, it's Kekosing's responsibility. Next, if you look at the affidavits submitted below, which were not rebutted, Mr. Arnett's declaration makes clear the City took no action in Kentucky. Does the amended complaint include allegations that would suggest that the City had transacted business in Kentucky? Your Honor, the amended complaint respectfully has been rebutted on all of those allegations. So if you look at the amended complaint, it does mention meetings. It doesn't say when the meetings occurred. There are general allegations that might suggest that, but they've all been rebutted by Mr. Arnett's declaration. Below, the Bells had a chance to ask for a discovery, submit their own affidavit. They didn't do any of that. So in Weller in 1974, in Thee Unison in 1991, and then in Woodwood in 2019, this Court has consistently said when a party offers affirmative evidence by way of affidavit at the dismissal stage, the other party, the plaintiff, cannot stand on its pleadings. If you choose to stand on your pleadings and all of your allegations that support your cause of action are rebutted, then there's no jurisdiction. Are those cases that you cited all cases where there was an actual hearing in front of the trial judge, as opposed to deciding it on the papers? No, Your Honor. In Wynwood, there was not an evidentiary hearing. That's the most recent case. The Court still said you need affirmative evidence to rebut a declaration like this. You can't just submit an amended complaint. It wasn't verified here. Just an amended complaint on its own cannot stand up to sworn testimony. And here, Mr. Arnett's testimony was substantiated by almost 1,000 pages of documentation, of contracts. It's the big brief on my desk. There is plenty of evidence showing that the city took no actions in Kentucky. In fact, the affidavit makes clear the city didn't learn about anything until October 20, 2017. That was after the fact. So there's nothing tying the city. I also want to make one other point. The Bells have not discussed the minimum contacts required by due process. Their brief gives short shrift to it. There's one paragraph that cites a standard, conclusory allegations, and no facts. The due process clause has to be satisfied here. It's the plaintiff's burden. They haven't met it here. They really haven't tried. And that's an independent basis for affirming dismissal. So because the Bells have forfeited the only argument they offer below, because they lose on the due process clause and the long-arm statute, I respectfully ask the Court to affirm the grant of dismissal. Thank you. Thank you. Your Honor, I would like to address the city of Cincinnati's arguments first. This dumping of this contaminated waste occurred in October of 2017. The Bells were told throughout the period of time that this material complied with the contract and was free of contamination. In November, told by whom? Cocosine. In November of 2017, the city of Cincinnati sent an engineer to the Bells' property to videotape it and take photographs. Mr. Bell called the engineer. Are you going into facts now that all occurred after the damages had occurred? Yes, but I think the discovery rule applies here. In November, the Bells were told by the city of Cincinnati that this material was not theirs and it was not their black sand. Of course, they knew it was their black sand. You're invoking the discovery rule in connection with jurisdiction over the city? What I'm saying is that the city could not actively hide their activities or their knowledge that their contaminated waste went to Kentucky. They told the Bells, this is not our dirt. It wasn't until January of 2018, the next year, that the Bells found out that this material was contaminated. So now I'm completely confused. What does that have to do with whether the city did or did not do business in Kentucky that led to the damages that you're claiming? All I'm saying is up until the period of time until the Bells found out this material was contaminated, the cause of action did not accrue against the city of Cincinnati. Well, what the city of Cincinnati took from them… We're not talking about whether a cause of action accrued. We're talking about whether there's personal jurisdiction over the city. The city of Cincinnati had the Bells' contract with Cocosine. They reviewed it. Obviously, this material was going to Kentucky. The city of Cincinnati knew that this material was contaminated in the very beginning because they had done a lot of environmental investigations prior to the project starting. The city reviewed the documents. They approved the Bells' property for a dumping site. They were on site when all of this material left their property in Ohio, crossed the bridge into Kentucky. When you say the city approved the dumping on their property in Kentucky, did the city actually know that it was going to be dumped in Kentucky because it reviewed the Cocosine Bell contract? Is that what you're saying? Yes, ma'am. The Bells' property… So the fact that a person in one state knows that two other people are going to take something that the person in that one state has and transport it to another state means that there's personal jurisdiction in that new state. When you then send your employees out to review the Bell property and take videotapes and photographs… That was after the dumping. After the dumping. But the Bells certainly believed at that time that the material was not contaminated. What is your best Kentucky case or other case to show that there would be personal jurisdiction over the city of Cincinnati in this context? Sorry, I don't have a case name for you. But I believe that they're taking affirmative action. They brought about the consequences of the action. They knew that this material was far too contaminated to go to Kentucky and they allowed it to go. They approved the contract. They supervised the process. It seems to me from reading this material that that's just a gross overstatement. So let me tell you why it sounds that way to me and then tell me why I'm reading this incorrectly. There doesn't seem to be a dispute that there were different categories of soil on this construction site. And they called it Type 1 and then Type 2, 3, and 4. And Cosoning sent all the Type 2, 3, and 4 to a certified landfill, as I understand it. The question is whether the Type 1 soil that everybody thought at the time was non-contaminated turned out to be contaminated. And you seem to be implying in this oral argument that the city knew all along they were going to take contaminated soil and send it to an unapproved waste site. And I don't see anything in the record that substantiates that. The city performed multiple environmental investigations prior to the project at Site 20. And this Site 20 is exactly where all of the contamination that was taken to the Bells property originated. The city knew based upon their prior investigations, their prior environmental investigations, that this material was contaminated. But that's where you're simply stating something as a fact. And it may be true, maybe not true, I don't know. That's what I understand to be the McDonald's site. And they did electromagnetic, or if I'm saying that correctly, testing because McDonald's wouldn't let them do any actual drilling on that particular site. It didn't show any evidence of contamination. So you can make an argument that they should have done more intrusive testing. But the record seems to show that what they did do that part of the soil was not contaminated until they got well into the digging and all of a sudden they found this black oozing stuff. That electromagnetic testing was looking for abandoned underground storage tanks and other metal objects. It was never intended and cannot tell the chemical composition of the soil. Then what's the basis of saying they knew it was contaminated? The city of Cincinnati had tested in the area of Site 20. They had tested in Site 20 and they knew that it had high levels of what's called PAHs or polyaromatic hydrocarbons and arsenic. Where would we look to in the record for all of this? Because I didn't see it in the briefing. Well, there are all of the exhibits, all of the environmental reports are exhibits to the record and I believe... Did money make a finding of fact on this? Well, I can't point specifically at this point in time but I do know that the city's attorney testified that Site 20 was contaminated. Well, it turned out it was. The question is when did anybody know it was contaminated? And you say the city attorney said they knew all along it was contaminated? Well, yes. Prior to the... That's fine. I'll look for that. Thank you. That helps. Your time is up. We have taken you beyond it. Thank you so much. Thank you all. The case will be submitted.